IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| JIREH, INC., MICKEY MOORES, and STEVEN CHAMPA, | : : : |
| Plaintiffs, | : : |
| v. | : : |
| JAMES CHAMPA, | : : |
| Defendant. | : : |

CIVIL ACTION NO.
1:18-cv-3076-AT

# **ORDER**

This matter is before the Court on Plaintiffs' Motion for Voluntary Dismissal [Doc. 34], and Defendant's Motion for Attachment and Garnishment [Doc. 38].

## I.  **Background**

In 2009, the Parties became co-owners of a company called Jireh, Inc. (Complaint, Doc. 1 at 5.) Plaintiffs Mickey Moore and Steven Champa each own one-third of the company, and Defendant James Champa owns most of[1] the final third. (*Id.*) In 2012, a dispute arose between the Parties about ownership stakes and allegedly incomplete payouts that resulted in costly and protracted litigation. (*Id.* at 6–8.) Plaintiffs' Complaint[2] seeks to enforce a buy-out agreement

---

[1] Defendant Champa states in his Amended Answer and Counterclaim that his "interest now stands at .332% of the Jireh equity, [Defendant Champa] having conveyed three shares of his 1,000 shares to pay certain bills…for services rendered to him and his family." (Amended Answer and Counterclaim, Doc. 14 at 6.)
[2] The operative Complaint in this matter is the "First Amended Complaint" that was filed in the State Court of Fulton County (Doc. 1 at 5–11), and removed to this Court by Defendant in June

negotiated between the parties in 2017 in which Plaintiffs allegedly agreed to pay $1.5 million to Defendant in exchange for his 1/3 interest in Jireh, Inc. (*See* Complaint, Doc. 1 at 8–11.) Plaintiffs alleged that Defendant Champa's counsel made a counteroffer as part of the negotiations:

> 22. On November 6, 2017, counsel for James Champa sent email correspondence … to undersigned counsel in response, and with a counteroffer, to a proposed settlement and buy-out agreement from the Plaintiffs…
>
> 23. In this email correspondence, counsel for James Champa proposed the following: 'The simplest solution and one which James now proffers is to pay him the value of his PTI/shareholder profit in a lump sum [$1,082,00] and pay $450,00 for the redemption of James' stock – 20 monthly installments of $22,500 each, as the terms of your proffered agreement provide …[']

(Complaint, Doc. 1 at 8.) Plaintiffs allege that they timely accepted the terms of this counteroffer and agreed to pay Defendant Champa a total of $1.5 million, which they suggested be allocated as "$1.1 million to the PTI and $400,000 to the share purchase, or divide it any other way you choose." (Complaint, Doc. 1 at 9.) Plaintiffs told Defendant's counsel that they would accept his terms only if he sent "an electronic copy of that agreement fully executed by your client[,]" which would then be countersigned by the Plaintiffs. (*Id.*) According to the Complaint, Plaintiffs never received any further response from Defendant's counsel.

---

2018 (*See* Notice of Removal, Doc. 1). The Court refers to the "First Amended Complaint" as "the Complaint" throughout this Order.

In his Amended Answer and Counterclaim,[3] Defendant Champa admits that such a negotiation took place, but denies that any agreement was ever completed, citing disputes about proper valuation of company revenues and profits allegedly due to Defendant Champa. (Answer, Doc. 2 at 4–7.) In his Counterclaim, Defendant/Counterclaimant Champa alleges that the Plaintiffs/Counter Defendants "have proximately caused James [Champa] damages in the amount of $1,082,219 plus accumulated interest and penalties by withholding from him his previously taxed 'S' corporation income ('PTI') of JIREH for calendar ... years 2011-13 and 2015-16." (Counterclaim, Doc. 14 at 8–9.) Counterclaimant Champa further alleges additional damages of $450,000 for "refusing to complete the 2017 Jireh Tax returns in conjunction with the agreed on (November 2017) purchase of James' equity interest in Jireh." (*Id.* at 9.) These amounts of money are the same as were allegedly negotiated by Counterclaimant Champa's lawyer in 2017 before the deal fell apart. (*Compare* Counterclaim, Doc. 14 at 8–9 *with* Complaint, Doc. 1 at 8.)

## II. Motion for Voluntary Dismissal

In their Motion for Voluntary Dismissal of their claims, Plaintiffs state that "[i]n the more than two years since Plaintiffs initially made this buy-out offer, Jireh has seen a decrease in revenues, particularly in this last year." (Motion to Dismiss,

---

[3] Defendant Champa incorporated by reference the first 39 paragraphs of his originally-filed Answer, and amended it only to add the Counterclaim. (*See* Amended Answer, Doc. 14 at 1.) The Court will cite to both the originally-filed Answer – available at Docket Entry No. 2 – and the Amended Answer and Counterclaim (Doc. 14) throughout this Order.

3

Doc. 34 at 1.) Additionally, according to Plaintiffs, Jireh is involved in some legal proceedings which may require payment of legal fees and which are expected to result in decreased enrollment in Jireh, which will negatively affect Jireh's revenues. (Doc. 34 at 1–2.) Accordingly, Plaintiffs assert that "Jireh's offer to Defendant no longer represents a fair price for his ownership interest." (*Id.* at 2.)

Defendant Champa opposes voluntary dismissal, although his opposition seems mostly premised on whether dismissal of the Complaint would affect his Counterclaim, as evidenced here, where Defendant Champa writes, "Plaintiffs seek to have their case and eat it too. FRCP 41 (b) is abundantly clear that a plaintiff's request for voluntary dismissal cannot serve to eradicate a defendant's counterclaim." (Response, Doc. 37 at 4.) Defendant Champa claims that, despite Jireh's present financial condition, "the stock purchase agreement remains in force." (Response, Doc. 37 at 4.) Plaintiffs clarify in their Reply that they "understand that [Champa's] counterclaims will not be dismissed along with their claims." (Reply, Doc. 40 at 3.) Indeed, Rule 41(a)(2) states,

> Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a)(2).

Besides this issue, Defendant argues that dismissal of the Plaintiffs' Complaint should be with prejudice, because there is no documentary evidence "for the claim that Jireh is unable to fund the buy out payment at this time." (Doc. 37 at 6.) Defendant further argues that Plaintiffs have not presented any evidence that they are involved in the "franchisor [Online Trading Academy]'s regulatory woes with the FTC," and that a dismissal with prejudice "will serve to move the litigation here forward between these parties." (Doc. 37 at 8.) Plaintiffs reply that even though they are not named parties, "[Online Trading Academy] has requested that its franchisees contribute to litigation and operational costs." (Reply, Doc. 40 at 6.) Plaintiffs also correctly note that this does not really matter one way or the other, and that the "Plaintiffs are entitled to seek to dismiss their claims against Defendant." (*Id.*) Plaintiffs further reply that they seek dismissal without prejudice because "Plaintiffs' defenses to these counterclaims will rely, in part, on the facts and arguments arising out of the negotiation and agreement between the parties[,] [and] [i]f Plaintiff's claims seeking to enforce this no longer viable agreement were dismissed with prejudice, these defenses would be compromised[,]" and "because that is the default process under Rule 41(a)(2)[.]" (Reply, Doc. 40 at 5, 6.)

Defendant Champa's primary concern is the survival of his counterclaim. In granting the Plaintiffs' motion however, the counterclaim remains active and becomes the operable (and only) claim before the Court. The Motion for Voluntary Dismissal [Doc. 34] is **GRANTED**, and the Plaintiffs' Complaint is **DISMISSED** without prejudice, pursuant to Rule 41(a)(2).

### III. Motion for Attachment and Garnishment

Defendant Champa also moves for "attachment against Plaintiffs' assets and garnishment of Plaintiff Jireh's bank accounts to preserve the assets for the stock redemption." (Motion for Attachment, Doc. 37 at 2.) "Attachment is an ancillary remedy by which a plaintiff acquires a lien upon the property of a defendant in order to obtain satisfaction of a judgment that the plaintiff may ultimately obtain at the conclusion of the litigation. *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994) Rule 64 of the Federal Rules of Civil Procedure authorizes the prejudgment attachment of property only in certain situations. *Mitsubishi*, 14 F.3d 1507, 1521–22 (11th Cir. 1994) (citing Fed. R. Civ. P. 64). Rule 64 makes available to the Court "all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action" and provides that – unless prohibited by the Constitution or an applicable federal statute – such remedies "are available under the circumstances and in the manner provided by the law of the state in which the district court is held." *Id*. Rule 64 specifically lists attachment as one such available remedy, along with "other corresponding or equivalent remedies, however designated." *Id*. (citing 7 James W. Moore et al., *Moore's Federal Practice* ¶ 64.04[1] (2d ed. 1993); 11 Wright & Miller, *supra,* § 2932). Therefore, in all cases in federal court, "state law is incorporated to determine the availability of prejudgment remedies for the seizure of person or property to secure satisfaction

6

of the judgment ultimately entered." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters, Local No. 70,* 415 U.S. 423, 437 n.10 (1974).

In Georgia, prejudgment attachment is subject to the same conditions as post judgment attachment in cases making demands in contract or in tort. *Mitsubishi*, 14 F.3d at 1522; O.C.G.A. § 18-3-1. Per Georgia law, attachments may issue when the debtor:

> (1) Resides out of the state;
> (2) Moves or is about to move his domicile outside the limits of the county;
> (3) Absconds;
> (4) Conceals himself;
> (5) Resists legal arrest; or
> (6) Is causing his property to be removed beyond the limits of the state.

O.C.G.A. § 18–3–1.

None of the first five grounds of the statute apply here, nor does Defendant Champa appear to argue they do. Rather, in citing "one of the alternative grounds" of the statute, Defendant Champa may be making an argument for application of the sixth ground of O.C.G.A. § 18-3-1, that the Plaintiffs are "causing [their] property to be removed beyond the limits of the state," although this is not clear on the face of the motion.[4] Defendant Champa has not demonstrated that any of the statutory grounds for attachment apply to the Plaintiffs here, and has not

---

[4] Defendant Champa appears to argue that the Georgia attachment statute applies because the Plaintiffs have allegedly misappropriated funds which would otherwise be available to satisfy his demand. (Motion for Attachment, Doc. 37 at 10 ("The facts [relating to the alleged misappropriation] and the belief derived from them serve to satisfy one of the alternative grounds for the issue of a writ of attachment under Georgia law.").)

presented any reason to believe that, even if the Plaintiffs *are* misappropriating funds from the company,[5] those funds are somehow beyond the reach of the state.[6]

Defendant Champa also did not address the attachment statute's bond requirement. *See* O.C.G.A. § 18-3-10. This portion of the statute says that,

> No writ of attachment shall issue unless accompanied by a bond with good security, conditioned to pay the defendant all costs and damages that he may sustain in consequence of the issuance of the writ of attachment in the event that the amount claimed to be due was not due, that no lawful ground for issuance of the attachment existed, or that the property sought to be attached was not subject to attachment. The bond shall be in a sum equal to twice the amount claimed due in the plaintiff's application. The bond shall be presented to the clerk of the court where the application provided for in Code Section 18-3-9 is sought to be filed for approval by such clerk prior to filing of the writ of attachment.

O.C.G.A. § 18-3-10. Defendant Champa seeks a writ of attachment against the Plaintiffs in the amount of $2,205,021.66. (Motion for Attachment, Doc. 37 at 11.) Pursuant to the statute, Defendant Champa would therefore have needed to offer a bond to the Clerk of the Court equal to twice that much, or $4,410,043.32. He did not do so.

Defendant Champa failed to identify appropriate grounds for attachment under O.C.G.A. § 18-3-1, and did not offer a bond to the Clerk of the Court.

---

[5] *Cf. In re Fredeman Litig.,* 843 F.2d 821, 826 (5th Cir. 1988) ("The plaintiffs ... contend primarily that the defendants are scoundrels who will try to escape judgment, an allegation that, even if true, would not justify the preliminary injunction [including issuing a writ of attachment].")
[6] *See* O.C.G.A. § 18-3-9(b) ("Upon presentation of plaintiff's sworn application for a writ of attachment, it shall be the duty of the judge to inquire into the facts alleged, going beyond mere conclusions of fact alleged by the plaintiff and clearly setting forth the facts entitling the creditor to a writ of attachment as set forth in Code Section 18-3-1. Upon consideration of the inquiry, the judge shall have the discretion to grant or deny the issuance of a writ of attachment.")

Therefore, the portion of Defendant Champa's Motion that seeks a Writ of Attachment is **DENIED**. [Doc. 37.]

Defendant Champa also argues for garnishment of the Plaintiffs' Georgia bank accounts, claiming that, "[b]ecause it is believed that Defendant Jireh never actually established a 'AAA' account, to the extent that Jireh has assets at Bank of America or any other financial institution where the undistributed K-1 funds may have been deposited, such accounts are subject to the right of shareholder distribution to the Defendant at stock redemption." (Motion for Garnishment, Doc. 37 at 11.) However, in 2016 the Georgia General Assembly passed Senate Bill 255, amending the Georgia Code to repeal the portions which previously allowed for pre-judgment garnishment and pre-judgment garnishment is no longer an available remedy in Georgia. Accordingly, the portion of Defendant Champa's Motion that seeks entry of pre-judgment garnishment is **DENIED**. [Doc. 37.]

## IV. Conclusion

The Plaintiffs' Motion for Voluntary Dismissal is **GRANTED**, and the Complaint is **DISMISSED without prejudice**, pursuant to Fed. R. Civ. P. 41.

Accordingly, the operable and sole Complaint before the Court is Defendant/Counterclaimant Champa's Counterclaim. [Doc. 14.]

Defendant Champa's Motion for Attachment and Garnishment is DENIED. [Doc. 37.]

This case is ripe for mediation, as the dispute at the heart of the matter – according to the representations from the Parties – is simply how much Defendant

9

Champa is due for his shares. Accordingly, this matter is **REFERRED** to the next available Magistrate Judge for mediation. Mediation **SHALL** conclude no later than October 31, 2020.

If the parties agree to engage a private mediator and are able to agree on a proposed mediator, they **SHALL** notify the Court and the assigned Magistrate Judge within ten (10) days of the date of this Order of their intention to pursue private mediation and identify in their notice their agreed-up mediator.  Such private mediation shall conclude no later than October 31, 2020.

The parties are **DIRECTED** to file a status report within three (3) days of the conclusion of the mediation indicating whether this matter is resolved.

**IT IS SO ORDERED** this 30th day of August, 2020.

_____
AMY TOTENBERG
UNITED STATES DISTRICT JUDGE